35 N.J. Super. 333 (1954)
114 A.2d 19
ADOLPH GOTTSCHO, INC., A CORPORATION, PLAINTIFF,
v.
AMERICAN MARKING CORPORATION, A CORPORATION, AND JOHN K. JACKSON, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided January 25, 1954.
*335 Messrs. Eisenberg & Spicer (Mr. Jerome C. Eisenberg appearing), attorneys for the plaintiff.
Messrs. Daly, Hillis & McCormick (Mr. Robert R. Daly appearing), attorneys for defendants.
SPEAKMAN, J.S.C.
This is an action by Adolph Gottscho, Inc., a New York corporation authorized to do business in New Jersey, originally brought against four defendants: American Marking Corporation, Alfred Reinke, Gus Reinke Machinery & Tool Company, and John K. Jackson. The case first came on for trial before Judge Stein on May 22, 1952, at which time one day's testimony was taken; and the trial was then continued to a later date. At that time all the parties mentioned were in the action.
Subsequently the case was set down for trial before Judge Stein for June 9, 10 and 11, 1953, but due to his assignment elsewhere the matter came on before me temporarily assigned to try the case. By agreement and stipulation of the parties the testimony taken before Judge Stein on May 22, 1952 was part of the record before me and it was agreed that I should read it as though the testimony had been taken before me. The trial continued before me on the 9th, 10th, 11th and 12th of June, 1953, and was adjourned to the fall, when it commenced in the early part of October and concluded in December.
Before disposing of the meritorious questions involved in the case, a few preliminary observations will not be inappropriate.
*336 Between May 22, 1952, when the trial commenced before Judge Stein, and June 9, 1953, when it was resumed before me, the plaintiff and the defendants Alfred Reinke and Gus Reinke Machinery & Tool Company, entered into a stipulation of dismissal and an agreement, which was introduced in evidence at the opening of the trial before me on June 9.
The remaining defendants, i.e., Jackson and American Marking Corporation, which for convenience will be considered as Jackson hereinafter, thereupon made a motion to dismiss as to them on the ground that the release of one joint tort-feasor released the other. The soundness of this principle is unquestioned and it is the law of New Jersey. Here, however, it was decided that it was not a release but was a covenant not to sue, and that therefore the Jackson defendants were not released. The motion of these defendants at that time was accordingly denied. During the summer recess application was made to the Appellate Division under Rule 4:2-2(b), now R.R. 2:2-3(b), for leave to appeal from that order, which application was denied.
At the resumption of the trial before me this fall the defendants renewed the application to dismiss on the grounds previously stated, and I believe that at the conclusion of the plaintiff's case one of the grounds of a motion for dismissal was the same as that alleged in June and at the opening of the trial this fall. Again the application was denied.
In addition, on the motion to dismiss at the end of the plaintiff's case the defendants contended that because of the issuance of letters patent with respect to certain of the alleged secrets, while this case was pending, the court no longer had jurisdiction over the subject matter covered by the patent; and further argued that as to those alleged secrets which were not included in the letters patent issued, but which were disclosed in the application, that there was a public disclosure which entitled the defendant to a dismissal of the action. These motions were denied for the reasons then stated.
It seems to me that whatever the law may be elsewhere  and I question that that is the law elsewhere  it did not appear to be the law in New Jersey or in the Third Circuit, *337 nor did it appear to be the law in the Sixth or Seventh Circuits. As to New Jersey and the Third Circuit, refer to Stone v. Goss and Graselli Chemical Co., 65 N.J. Eq. 756 (E. & A. 1903); Thiberg v. Bach, 107 F. Supp. 639 (D.C. 1952), affirmed 203 F.2d 956 (3 Cir. 1953).
I reaffirm, on the briefs and on the arguments of ten days ago, the rulings heretofore made on applications for dismissal on the ground of the release of one tort-feasor releasing the other, the lack of jurisdiction of this court because of the issuance of letters patent with respect to some of the alleged secrets, and the disclosure by the patents issued as well as by the application for the patents. For a number of years the plaintiff has been engaged in the design, manufacture, and sale of automatic marking and printing machines used to imprint code numbers, lettering, and other marks of identification on packages. It appears from the evidence that in the packaging industry for many years it had been the practice to buy packages on which appeared the printing when purchased, or that the packages were bought flat and the printing would be applied before placing the object in the particular carton. The purpose and the function of the machines involved here is to provide a means whereby that imprinting or coding or whatever it might be, may be done after the carton has been packed and put through the assembly line  taking the case of the large machine, the Markocoder, as part of an assembly line  so that it would work in with our standards of manufacture in this country, the assembly line method of starting at one end and going right through to completion.
The plaintiff, in about 1948, commenced to develop the secrets involved here, and with respect to some it may have started earlier. Basically, they involved three machines: the Rolacoder, the Rolaprinter, and the Markocoder 3M.
In 1948 the plaintiff hired the defendant John K. Jackson. This hiring was the result of conversations between the defendant Jackson and the plaintiff's officer, Ira Gottscho. The conversations were started earlier in the year following the Packaging Show  which it is agreed was always held in the *338 spring  and these conversations were renewed in the summer or fall. Jackson was first hired as a salesman, and shortly thereafter as a design engineer. Then, in June 1949, he was made assistant general manager and continued as such until February of 1950, when he was made chief engineer. He continued, in that position, until he was discharged in September of 1950.
It was during this time that the plaintiff alleges substantially all the secrets here involved were perfected by experimentation and trial-and-error. The plaintiff claims that at the time of the hiring or before Ira Gottscho hired Jackson on behalf of the plaintiff corporation, they had a discussion in which Jackson agreed to keep confidential all the information he received. This is disputed by Jackson, but for the purposes of this case it seems to me unnecessary to determine that, because I am satisfied from the nature of the employment in which Jackson was engaged that the plaintiff corporation thought a confidential relationship existed within the meaning of that term as expressed in the opinion of Judge Goldmann in the case of Sun Dial Corporation v. Rideout, decided by the Appellate Division in January of this year and filed January 6, 1954, 29 N.J. Super. 361. No useful purpose will be served to reiterate herein the list of authorities mentioned in the Sun Dial case; most of them have received our consideration during the course of this trial.
The basic question here is whether the information transmitted by the plaintiff to the defendant was of a secret nature; that is, did it refer to trade secrets within the meaning of that term.
It seems to me to be beyond question that the defendant had no knowledge of or experience with imprinting or coding machines prior to his employment with the plaintiff. While he had been employed for many years in one engineering capacity or another by different substantial organizations, particularly in the packaging industry, the record is absolutely barren of any evidence that he had had any experience whatsoever with coding or imprinting machines. The conclusion seems to me to be inescapable that any information and *339 knowledge that he obtained as to the design, construction and manufacture of imprinting and coding machines like those in issue here, was acquired by him while he was employed by the plaintiff corporation.
It was held in the Sun Dial case, following what seems to be accepted throughout the country, that
"a trade secret may consist of a plan, process, formula, device, or compilation of information used in one's business and which affords an opportunity to obtain an advantage over competitors who do not know or use it. There must be employed creative faculties in originating it, amounting to a meritorious discovery. * * * The trade secret need not, however, be patentable."
Now, the alleged trade secrets are all described in the answers to the interrogatories propounded by the defendant, numbered 16-A, 16-B, 16-C and 27. For convenience, it has been agreed by counsel that the nomenclature there used may be used by me in disposing of the various contentions made here.
Within the definition of trade secrets previously mentioned and as set forth in the Sun Dial case, it seems to me that substantially all of the alleged secrets set forth in answers to Interrogatories 16-A, 16-B, 16-C, 16-D and 27, are trade secrets. No useful purpose will be served in taking up item by item the overwhelming amount of testimony presented during the trial with respect to each of these alleged trade secrets, but it is sufficient to point out that although Jackson contends that anybody could do that which the plaintiff did, and which, as will hereinafter be mentioned, Jackson has done since he has left the plaintiff's employ, the fact is that the record indicates that prior to the time that the plaintiff corporation devised a vertical printing head, for instance, to be used with its imprinting machinery, it was not used, although the aniline process had been known and used extensively for approximately a half-century.
It is contended by the defendant, for instance, that the plaintiff's secret merely consisted of taking rollers which were *340 positioned horizontally rotating in an ink well (which defendant claims was the aniline process in horizontal position) and standing them in a vertical position.
Frankly, had this been the fact, someone long ago would have mastered that simple process. The fact that it was not done is evidence that it was not so easy as the defendant would have it appear, and the fact that he was able to do it easily  having acquired the knowledge while he was in the plaintiff's employ  is unimpressive.
Similarly, with respect to the method by which baselock type is secured, which now has the trade name of Metalok. Here, again, for years the trade apparently was content with rubber type and rubber baselock which was loose and slipped; and here, again, the defendant says that it is simple to do. But here, again, no one did it before the plaintiff conceived the idea and perfected it, and in this particular case, as I believe, a patent was issued with respect to that secret. Therefore, in addition to being a secret there is presumptively novelty and invention, as there is, I believe, also with respect to the vertical printing head which is now in part protected by patents. Here, again, it is not only secret, but as to these items there appears to be novelty and invention, although that is not necessary in order to consider it a trade secret.
The evidence clearly indicated from Mr. Jackson's testimony at the first day of the trial before Judge Stein, when Jackson was called as a witness by the plaintiff, that he was using information that he had acquired while in the employ of the company in his business in the manufacture of the Cadet, the Major and the Commander. Later during the course of the trial at the conclusion of the plaintiff's case, over the objection of the plaintiff, I permitted him to testify as to what he termed to be corrections of his prior testimony. The corrections were simply afterthoughts acquired by him after he had heard substantially all the plaintiff's evidence. They did not correct, but they did help to enlighten me with respect to his attitude concerning the plaintiff's secrets.
Jackson, in my opinion, has a capacity, and perhaps an unusual capacity, for retaining that which he has done and *341 copying it, and perhaps making that which he has done a little prettier; in other words, dressing it up. I think his engineering ability in that regard cannot be denied, and I think in many respects the machines he manufactured are more dressed up, more appealing to the eye, than the plaintiff's, although in my view they have in them the principles and information with respect to which he acquired knowledge while in the plaintiff's employ.
I cannot find in the evidence that the plaintiff has sustained the burden that Jackson actually took from the plaintiff physical designs or drawings or blueprints from which he designed the Cadet, the Major and the Commander.
However, I am satisfied that the design and construction of all three and the appearance of all three to some extent, are sufficiently similar to those of the plaintiff's products, namely, the Rolacoder, the Rolaprinter, and the Markocoder 3M, and that the inescapable inference must be drawn that the knowledge of the principles that Jackson had acquired were so ingrained in his mind that without resort to the actual blueprints or copies thereof he was capable of redesigning them and having them manufactured by Reinke, which company, incidentally, had manufactured the products of the plaintiff.
With these preliminary observations I will now indicate my findings by adopting the numbering as set forth in my copy of Exhibit P-49 for identification.
Answer 16-A:
(1) Whereby ink is supplied to a roller of two vertically mounted rollers; (2) whereby ink is evenly distributed to a roll of two vertically mounted rollers, and (3) by which ink is recirculated.
I find these to be the application of the principle which Jackson learned while in the plaintiff's employ and which in my opinion in that combination constitutes a trade secret.
Similarly with respect to (4) by which the pressure between the said rollers may be varied; (5) by which the baselock type is secured; (6) by which the circumference of the die wheel is determined to be one-half of the pusher distance; *342 (7) whereby the die wheel is spring-loaded, and (8) whereby the die wheel may be raised or lowered without switching off the machine.
All these secrets are contained in the American Commander model which the plaintiff examined and which are likewise principles contained in plaintiff's Markocoder 3M. I recognize that in dimension there is a difference and I recognize that in appearance there is some dissimilarity, although to me there was great similarity in many respects; but so far as the applicable principles are involved, I can find no substantial dissimilarity, and on the contrary I find great similarity.
Answer 16-B:
(1) Whereby the ends of the metering and ink rolls are wiped.
There is no particular secret here involved. As I recall this particular item, these are the "doctor" blades and were known and used before. While they are used with respect to the Rolaprinter, in many instances they are not used or are taken off, and it was demonstrated that they were in existence and known prior to 1948 when they were employed by the plaintiff.
(2) Whereby the effective weight of the die wheel is controlled, and (3) by which the baselock type is secured.
It seems that they are substantially copies and substantially similar in the American Major to those contained in the Rolaprinter. In my opinion they constitute secrets, and the defendant Jackson acquired knowledge with respect to them during his employment with the plaintiff.
Answer 16-C:
(1) By which ink is fed to the ink roller.
It seems to me that this constitutes a trade secret.
(2) By which the rubber roller is rim-driven by die wheel.
I am unable to find that this constitutes a trade secret.
(3) By which the rubber roller is eccentrically mounted; (4) by which the ink roller is mounted and spring-loaded; (5) by which the baselock type is secured, and (6) by which the effective pressure at the die wheel is controlled.
*343 In my opinion these are all trade secrets which the defendant acquired while in the plaintiff's employ and are substantially similar in the American Cadet, which is in appearance, design, and function substantially similar to plaintiff's Rolacoder.
Answer 16-D:
(1) By which ink is fed to the ink roller and (2) by which the ink is further fed to the metal transfer roller.
These seem to me to be trade secrets which the defendant acquired while in the plaintiff's employ and are substantially similar in the American Commander to the plaintiff's Markocoder 3M.
(3) By which the ends of the roller are wiped.
In my view this is not a trade secret.
(4) By which the entire printing head assembly is mounted under the table beneath an opening in the table; (5) by which a chain with lugs on it traveling in synchrony with the above-mentioned printing head carries the objects over the opening for printing from below, and (6) by which the baselock type is secured.
In my view in combination these constitute a trade secret, information with respect to which the defendant acquired while in the employ of the plaintiff corporation.
(7) By which products are separated by means of a star wheel; (8) by which there is a belt infeed carrying the products to the separator, and (9) by which there is a belt outfeed carrying the products away from the chain lug conveyor.
In my view these are not trade secrets. Furthermore, the defendant's prior experience with packaging machinery leads me to believe that he had information with respect to these items and acquired it prior thereto, so that any information he acquired from the plaintiff with respect to these items were not confidential or trade secrets.
Answer 27:
(1) Use of vertical infeed belts; (2) use of mechanism to prevent re-inking of die wheel when package flow is interrupted; (3) use of overhung mounting of ink and die *344 rollers and fountain; (4) use of interchangeable rings for baselock type and sleeves for adhesive back dies; (5) adjustment of pressure between rollers without stopping machine; (6) use of mechanism for re-positioning die wheel; and (7) the size and position of the fountain in relation to the sizes and positions of the metering roller die wheel and ink roller.
In my view these are all trade secrets within the rule I have just discussed, knowledge of which was acquired by the defendant while in the plaintiff's employ, and employed by the defendant in his machines.
(8) The use of hold-down to control package imprinting position.
I am unable to find that this is a trade secret.
Now, with respect to those matters which in my view are trade secrets within the meaning of the rule as expressed in the opinion in the Sun Dial case by the Appellate Division, and in view of the fact that I have already found that the defendant Jackson was in a confidential relationship, the question remains as to whether there has been a disclosure of these, either in whole or in part, and whether the plaintiff in the design, manufacture, and sale of these took sufficient precautions to keep them within the rule of trade secrets.
It seems to me there can be no question but that sufficient precautions were taken in view of the nature and type of the secrets involved. Without detailing the evidence, when conferences were had about something new the evidence indicates that they were held not in public, but more or less in private  some, in fact, very private. But in view of the nature of the various steps to be taken, no one person in the plant except Mr. Hirschey, Mr. Jackson and Mr. Gottscho knew all the secrets, and while Mr. Alessi may have known some of them I doubt that he knew all of them. I am confident that some of those who professed to have had knowledge, did not.
Now we come to the question as to whether there has been such disclosure which would prevent the plaintiff from prohibiting the defendant from using these, or any of them. Let *345 me say that I do not think that all the secrets are completely disclosed, but I think some of them are substantially disclosed. Take, for instance, (1) and (3) in the answer to Interrogatory 16-A. Standing alone they are in my view completely disclosed, but in combination with (2)  and that is where their effective use is concerned  they are only partially disclosed.
I am, however, satisfied that in time, with the expenditure of money, by trial and error, by design and redesign, any person who cares to take the time and spend the money could copy all the plaintiff's secrets and could thus acquire a knowledge of all the secrets, even though he might not know all the reasons applicable to each and every one thereof. It is the plaintiff's contention that one must not only be able to copy, but must have a knowledge of all the secrets and all the information. I disagree with that. If one is able to copy substantially all of them and to work them effectively, that is a disclosure, even though he may not know all the implications of each of the secrets. As a matter of fact, the plaintiff himself admitted he did not recognize the full import of one of the secrets until after he had tried it.
On the other hand, I disagree with Jackson that since there is this much of a disclosure, that that entitles him to manufacture them. I am satisfied that he could not have manufactured them as readily except by the prior knowledge he obtained. He could do it without the expenditure of research, effort, time and money, which the general public itself would have had to do, and I think it is that inequitable conduct which the court had in mind when it said that those people in a confidential relationship who have acquired knowledge of secrets when they were secrets, may be enjoined from utilizing them even though later there is in some form or another a public disclosure so that the public could copy them by the exercise of perseverance and time, and the expenditure of money.
I think the law of New Jersey as set forth in the Stone v. Goss and Graselli Chemical Co. case and mentioned in the Sun Dial case, and the Third Circuit cases of Thiberg v. *346 Bach and Bohlman v. American Paper Goods Company, D.C., 53 F. Supp. 794, applies to the case here. That rule, of course, is binding on me, and accordingly there will be judgment for the plaintiff in accordance with the views herein stated, and there will be an injunction and an accounting by the defendant.