79 N.J. Super. 156 (1963)
191 A.2d 67
ADOLPH GOTTSCHO, INC., A CORPORATION, PLAINTIFF,
v.
BELL-MARK CORPORATION, A CORPORATION OF NEW JERSEY, JOSEPH MASTRACCHIO, LEONARD GUIDA, AND ANDREW J. ALESSI, JR., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided May 3, 1963.
*157 Messrs. Clapp & Eisenberg for plaintiff (Mr. Jerome C. Eisenberg, appearing).
Mr. Robert F. Colquhoun for defendants Bell-Mark Corporation, Joseph Mastracchio and Andrew J. Alessi, Jr.
Messrs. Sheeran and Ospenson for defendant Ross Clark (Mr. James A. Ospenson, appearing).
HERBERT, J.S.C.
Adolph Gottscho, Inc. charges that its trade secrets have been improperly used or dealt with by the *158 defendants, and it seeks relief by injunction or damages or both. The products made and sold by Gottscho are marking machines. Although the machines vary enough in size, design and method of use to make any summary descriptions subject to exceptions, they may be described in general terms as small printing machines designed and used to imprint a brief legend of some sort upon a container of products, or a product, as it comes off an assembly line. The process used is called "Flexography," a term adopted by an organization known as the Packaging Institute.
Proof was offered at trial that in recent years (as every consumer knows) there have been great increases in the practice of marketing goods in manufacturers' packages, and this growth has created an extensive demand for devices which will print upon a package at the time it is filled and closed for shipment. The information printed may be only the date of packaging, or it may be somewhat more extensive, but usually it will be in the nature of a last-minute legend to supplement the regular printing which has been placed on the container by other means. An informative short description of Flexography, its dependence upon quick-drying inks, its uses and the functions of machines like those of the plaintiff can be found in Wolfe, Printing and Litho Inks (5th ed. 1957), pp. 331 and 336.
The Gottscho company has made itself a leader in the marking machine business. The defendant Bell-Mark Corporation is in direct competition. It sells and offers for sale a line of marking machines designed to do essentially the same work as comparable Gottscho machines. The Bell-Mark business was commenced in 1959, long after the Gottscho business was established. Gottscho claims the right to equitable protection against the use in Bell-Mark's machines of a number of features which Gottscho says it originated and used before Bell-Mark entered the field. Gottscho also contends that the defendants other than Bell-Mark are in one way or another answerable in equity for contributing to Bell-Mark's use of Gottscho's trade secrets.
*159 The trial was exceptionally long. Over three months elapsed between the swearing of the first witness and the close of the last one's testimony. Several hundred exhibits were received, consisting of drawings, machines and parts of machines as well as documents. The complexities of the case were due in part to the number of trade secrets claimed by the plaintiff and to the period of years over which the testimony had to range in order to develop and contest those claims. However, I think the complications of the case and the length of the trial resulted in part from uncertainties in this field of the law, uncertainties about what a plaintiff must show to become entitled to relief. See Ellis, Trade Secrets, c. 1.
All of the plaintiff's claims to trade secrets depend upon physical characteristics of Gottscho machines. Although this generalization is not intended to rule out the effect of physical characteristics upon functioning, it is of some importance to note that this case does not involve manufacturing processes which remain inside the plant when a machine is shipped (e.g. Sun Dial Corp. v. Rideout, 16 N.J. 252 (1954)), or chemical formulae so well hidden in a marketed product (e.g. Colgate-Palmolive Co. v. Carter Products, Inc., 230 F.2d 855, 863 et seq. (4 Cir. 1956)) that they remain unknown even in the laboratories of competitors.
I think the first question to be answered is this: Are those characteristics of Gottscho machines which are urged as a basis for equitable relief secrets in the dictionary sense of something kept from the knowledge of others, or revealed only to a few? Though the answer will not dispose of the case, it will be an important step toward a decision.
Machines incorporating the features for which the plaintiff seeks protection have been sold and offered for sale on the open market. Particular machines have been sold by the thousands, while other machines have been designed for a smaller market or have received a much less cordial reception from customers. My conclusion is that those characteristics of its products on which the plaintiff's claims to "trade *160 secrets" rest are not secret in the dictionary sense. This, in turn, is based upon the conclusion that the characteristics in question have been disclosed in the plaintiff's own machines and thus made available for copying or imitation by anyone interested enough to employ a generally skilled technician to make an inspection and take measurements.
I will not discuss each and every machine feature on which the plaintiff bases a claim to a trade secret. However, a few may be referred to as examples: Marking devices are commonly mounted near the end of a manufacturer's assembly line. The packaged product will pass the device on a conveyer belt or set of rollers, being imprinted as it passes. The marker can be mounted by fastening it to the frame of the conveyer. Some are "double hung," i.e., are fastened to both sides of the conveyer frame so that the package or product to be marked passes between the mountings of the marker. Others are "overhung" by having a mounting only on one side of the conveyer frame. These differences of mounting may be made obvious by comparing the conventional double-hung window, which slides up and down in a frame, to the casement-type of window which is hinged along one side and swings outward or inward on those hinges.
The mounting of a marking machine on a conveyer line has considerable practical importance because of the need to make adjustments, change printing type, replenish ink supply, and the like. There are advantages to the overhung mounting, and the plaintiff claims its use of that mounting is a trade secret. Secrecy in the dictionary sense is not present, however; anyone with an interest in the style of mounting can see at a glance the essential outlines of the overhung model, and I am satisfied that anyone with a general skill in designing machinery, having seen it, could successfully reproduce it. The advantages of the overhung mounting would also be readily apparent to an observer having knowledge of marking practices and problems in the packaging industry.
Other features of Gottscho machines, claimed as trade secrets, though less obvious, are still open to the world in the *161 units which have been sold. Many of the models have three rollers. One furnishes the ink supply, another carries the type face and does the printing, while the third one is located between the other two and has the function of transferring the ink smoothly and in proper amounts to the printing roller. To be able to adjust the amount of pressure between the surface of this transfer roller and the other two rollers is important. The plaintiff has secured a degree of adjustability by giving its transfer rollers an off-center or eccentric mounting. This feature is claimed as a trade secret. I have no doubt that a good mechanic, examining such a model, would recognize the eccentric mounting. He could then duplicate it. The defendants have even shown that a handbook which is distributed for advertising purposes by a well-known manufacturer of bearings describes the essential parts of this type of eccentric mounting.
Another feature claimed by the plaintiff as a trade secret is a sandblasted metal roller to transfer ink from a machine's ink roller to its printing cylinder. The sandblasting produces a roughened surface which handles the ink better than a smooth surface would. Essentially the same result might be obtained by engraving the face of the roller, but that would be more expensive. Here again, many sandblasted rollers have been sold, and I am satisfied that a skilled person by examining one of them would recognize without difficulty the method used in roughening the surface. Sandblasting is a common process, readily available in commercial metal treating shops.
To describe each of the other claims would produce no different conclusion than the one already stated for each claim which has been described. I am satisfied that all of them depend upon well-known mechanical devices and principles incorporated in machines which have been widely sold and even more widely offered for sale, and that such devices and principles are not hidden within the machines, but are readily available for recognition, inspection, testing and measuring by any person who might desire to copy or imitate.
*162 My conclusion that the plaintiff has disclosed to the business world those features of its machines which it claims are entitled to equitable protection seems to call for some comment about Adolph Gottscho, Inc. v. American Marking Corporation, 35 N.J. Super. 333 (Ch. Div. 1954), affirmed 18 N.J. 467 (1955). That litigation was, of course, prosecuted by the plaintiff in the present case; none of the present defendants was a party to it. Certain of the features of Gottscho machines which are now urged by the plaintiff to be trade secrets were before the court in the American Marking Corporation case and the plaintiff was granted an injunction against their use. However, I think Judge Speakman's opinion for the Chancery Division makes it clear, especially 35 N.J. Super., at page 345, that the relief granted was based upon the inequitable conduct of one Jackson, who was in a confidential relationship to the plaintiff and left to join American Marking Corporation, taking to his new employment all of the knowledge and skill which he had acquired while working for the plaintiff. The affirming opinion for the Supreme Court (18 N.J., at p. 475) had this to say about Jackson:
"His conduct was grossly improper and gave rise to the plaintiff's cause of action, based on long-settled equitable principles and supported by the marked changes in the attitude of the law towards the need for commercial morality."
This brings me to a consideration of the conduct of the defendants and such relationships as they had with the plaintiff. Have the defendants, or any of them, acted so inequitably as to make it improper for them to use or deal with features of the plaintiff's products, features which would be readily available in the machines themselves for use by a stranger to the plaintiff having a fair amount of skill in designing and building machinery?
The defendants Guida and Alessi both worked at one time for the plaintiff. Guida has not appeared in the case, except to the extent that he gave a deposition sought by the plaintiff. *163 He was employed by Gottscho in 1947 as a young man just out of school, and left in 1950. He was a draftsman. He had no contract relating to post-employment activities. Leaving Gottscho, he went to work for the American Marking Corporation; but he was not a defendant in the suit brought by Gottscho against that firm and other defendants. However, in one respect he was affected by the injunction in that case  an injunction which prohibited the named defendants and "their agents, servants, employees, successors and assigns" from using Gottscho's trade secrets. When a civil contempt proceeding was prosecuted against American Marking Corporation, Guida and some other employees were named as corespondents, were found guilty, and fined $25 each.
The order imposing fines was signed in the summer of 1957. Toward the end of 1958 Guida began to make drawings for Ross Clark, Jr., a defendant in the present case. Clark is a man who makes his living primarily as a salesman of packaging machinery, marking machines, conveyor equipment and related products. There is no question about his having acquired a store of technical knowledge in the course of his work, and this was true when he made his arrangement with Guida, whom he knew to be a former employee of Gottscho and of American Marking.
One result of the drafting done by Guida for Clark was a set of drawings which Clark sold to Bell-Mark Corporation on February 17, 1959. At least some of those drawings depicted marking machines, or parts of such machines, incorporating features claimed by the plaintiff as its trade secrets.
The record justifies the inference, I think, that Guida and Clark, as well as the defendant Mastracchio, who was Bell-Mark's president, all knew that the set of drawings, if used in manufacturing, would result in marking machines containing features like those which Gottscho had successfully enjoined American Marking Corporation from using. Nevertheless, they were used by Bell-Mark, at least in modified form.
*164 The plaintiff relies on the judgment of contempt against Guida, plus knowledge of it by the other defendants. I have concluded that the contempt adjudication has no significance at all in this case. As to Guida, it was based entirely upon his activity as an employee of American Marking Corporation; that he had formerly worked for Gottscho was immaterial. An injunction against a defendant which purports to forbid activities he carries on through employees has no bearing upon what an employee can or can not do once the employment ends. Alemite Manufacturing Corp. v. Staff, 42 F.2d 832 (2 Cir. 1930).
Guida, when he left Gottscho, made the mistake of going to work for an employer, American Marking, who was not free to compete. Yet when he worked for Clark, and later on Bell-Mark for a time, he was serving employers who had no ties with Gottscho like the tie American Marking had through John K. Jackson. I conclude that the plaintiff's case, in so far as it depends upon Guida's employment by the other defendants and the drawings he made for them, must be judged by the same standards which would have been applicable had Guida left Gottscho in 1950 as a draftsman and gone to work for a legitimate competitor. There was, as I have said, no post-employment contract and, having ruled out the contempt judgment, I fail to find in the record here enough to furnish a basis for restricting Guida's use in subsequent employment of those marking machine features which the plaintiff claims as trade secrets.
The proofs indicate he was a capable draftsman, perhaps a talented one. Nevertheless, his position was only that of draftsman, and he was very young in age and experience. He held no official office or title. If it had been impressed upon him by the plaintiff that he must not use its secrets or betray them, his technical knowledge and skill would have made him aware that the "trade secrets" alleged in this case were not secrets at all because draftsmen like himself could imitate and duplicate them easily from Gottscho machines which anyone could buy. Comparison with John K. Jackson is inevitable, *165 also helpful. Jackson left a truly important position with Gottscho for the purpose of becoming the key figure in American Marking Corporation. What he did was something of a stab in the back for the employer he left. For a young draftsman to leave and join a competitor, even though he takes with him skill in reproducing nonsecret features of machines on which he has worked, is not to be classed with Jackson's conduct. Carver v. Harr, 132 N.J. Eq. 207 (Ch. 1942), Midland-Ross Corp. v. Yokana, 293 F.2d 411 (3 Cir. 1961), and Dollac Corp. v. Margon Corp., 164 F. Supp. 41, 56 et seq. (D.C.N.J. 1958) are the applicable precedents here rather than Adolph Gottscho, Inc. v. American Marking Corp., supra, and Franke v. Wiltschek, 209 F.2d 493 (2 Cir. 1953). Cf. Newark Cleaning & Dye Works v. Gross, 97 N.J. Eq. 406 (Ch. 1925), and Abalene Exterminating Co. of New Jersey, Inc. v. Elges, 137 N.J. Eq. 1 (Ch. 1945).
Some other factors bearing upon Guida's situation may be mentioned. Eight years passed between the end of his Gottscho employment and the commencement of his work for Clark. Even if it could be assumed that in 1950 features now claimed as trade secrets were new and not fully introduced to the market, the plaintiff's proofs indicate extensive marketing by 1958. Shifting to the content of the work he did for Clark and Bell-Mark, there was some emphasis during the trial on the striking and obvious similarities between Bell-Mark and American Marking Corporation machines. Indeed, it was shown by the plaintiff that some working parts are interchangeable between the two makes. Although Guida's designs did incorporate features which the plaintiff claims as its own, the exhibits and the testimony show he was duplicating or imitating, to a large extent, American Marking Corporation machines rather than Gottscho's, in other words, was using what he learned after his employment with the plaintiff ended. Finally, the Gottscho company did not make Guida a party to its suit against Jackson and American Marking Corporation, which suggests a recognition of significant *166 differences between his situation and that of Jackson by the persons with the best knowledge of the facts.
The defendant Andrew Alessi, Jr. also worked at one time for the plaintiff and later for Bell-Mark. He started with the plaintiff as a young draftsman in 1946 and left in June 1957. His work for Bell-Mark commenced a little over two years later. On August 28, 1951, when he was chief draftsman for the plaintiff in a department of five or six men, he signed a contract relating, among other things, to the disclosure of information. Later he was given more important positions, and for a time was chief engineer, plant manager and vice-president. I am satisfied he had wide knowledge of the Gottscho machines when he left the plaintiff in 1957. He and Mastracchio, president of Bell-Mark, were brought together by the defendant Clark. I have no doubt that both Clark and Mastracchio were moved by a desire to have Bell-Mark get the benefit of knowledge which Alessi had acquired in his years with Gottscho.
The Alessi-Gottscho contract of August 28, 1951 had in it a prohibition against serving a competitor during a two-year period after the employment ended. That prohibition was not violated, but the plaintiff contends there are nondisclosure restrictions in the agreement without time limit which were broken by Alessi when he worked for Bell-Mark, and also contends that Alessi violated a duty imposed by law when he shared his knowledge of Gottscho's "trade secrets" with his new employer. Alessi's case included, among other things, testimony that he understood the two-year time limit applied to the entire contract, and a claim that he was justified in so believing.
Paragraph 5 reads:
"I agree to keep confidential and not to divulge or to disclose to others, any and all knowledge I may have of the existence and contents of all property, documents, or things specified in paragraphs 1, 3, and 4 hereof."
The material which the quoted language incorporates by reference covers a broad range. It reaches out beyond knowledge *167 of secrets and confidences. Taken literally, the contract would probably be unenforceable. Taylor Iron and Steel Co. v. Nichols, 73 N.J. Eq. 684, 24 L.R.A., N.S., 933 (E. & A. 1908). If it is construed  as I think is sound  to be a restriction only against the disclosure of knowledge which can qualify as a secret of the employer (Conmar Products Corp. v. Tibony, 63 F. Supp. 372, 376 (D.C.N.Y. 1945)), then it is no restriction at all upon information which the employer himself has made available to everyone. Speaking of the effect of a patent upon a secrecy contract, Judge Learned Hand made a comment in Conmar Products Corp. v. Universal Slide Fastener Co., 172 F.2d 150, 156 (2 Cir. 1949), which is pertinent here:
"Conceivably an employer might exact from his employees a contract not to disclose the information even after the patent issued. Of what possible value such a contract could be, we find it hard to conceive; but, if an employer did exact it, others would perhaps be obliged to turn to the specifications, if they would use the information. Be that as it may, we should not so construe any secrecy contract unless the intent were put in the most inescapable terms; and the plaintiff's contract had none such."
When Alessi waited two years and then, by going to work for a Gottscho competitor, exercised the freedom his contract contemplated he should have at that stage, his conduct was not improper. He had been relieved of express and implied obligations to continue to respect confidences, because there was no longer anything confidential about the devices for which the plaintiff is seeking protection here.
Returning for a moment to the basic problem of classifying the plaintiff's devices, it is worth noting that I have considered the warning of Judge Clark against stressing in this field of the law the assumed abilities of a "good mechanic" to imitate a plaintiff's product. Franke v. Wiltschek, supra, 209 F.2d 493, 499. Nevertheless, I am convinced that the alleged "trade secrets" in the Gottscho machines are plainly there for the good mechanic to see, measure, test and copy. Judge Speakman recognized that as to the features which he *168 held protectible in Adolph Gottscho, Inc. v. American Marking Corp., 35 N.J. Super., at p. 345. On the evidence presented to me I would minimize the difficulties of imitation more than he did. I had the benefit of seeing both Gottscho and Bell-Mark models in operation. As the devices are for the most part not large, many of them have been marked in evidence. The machines themselves have been very persuasive. These really are simple things, using old and elementary principles, and, most important of all, are built into the machines for anyone to see. By taking this view I do not discount in any sense the very substantial accomplishment of the plaintiff in making itself a leader in the marking machine business by designing, building and selling reliable and effective machines.
To buy a neighbor's product, copy it and then sell the copy will not be regarded as business conduct on the highest moral level. Yet copying is not per se actionable. Squeezit Corp. v. Plastic Dispensers, 31 N.J. Super. 217 (App. Div. 1954). Of course, Bell-Mark had its work eased and hastened by the help of Guida and Alessi, but because they were free to use their knowledge of these devices for the benefit of a new employer, their help does not change the legal result.
The preceding discussion, insofar as it relates to machines and their features, must be supplemented by a comment about the "J.C.L. Sideline Coder." It was built by three engineers in California who used their initials in naming it. The coder's function is to print upon the recessed bottom of a container, such as a modern spray can, which is moving along a conveyor. Both the plaintiff and Bell-Mark learned of the machine in 1960. It had been manufactured and sold before that; it had also been advertised in trade publications and exhibited at an industry show or shows. Mr. Low, one of the designers, when he first wrote to Mr. Ira Gottscho, gave names and addresses of "three prime users" of the machine, one of the three having 14 units. On July 21, 1960 Mr. Low and Mastracchio reached an informal understanding about sale of the coder to Bell-Mark, but a formal agreement was to follow. *169 On July 22 one of the machines was shipped by express from California to Bell-Mark in New Jersey. Thereafter there was considerable correspondence back and forth, including exchanges of drafts and revisions of a proposed contract. On August 3 Mr. Low sent Mastracchio a telegram withdrawing the offer. This was followed by a letter of apology by Mastracchio for delay in getting his attorney to prepare a revised agreement, but the relationship came to an end with a telegram from Low a few days later stating that he and his associates had signed with another company and requesting a return of the machine in Bell-Mark's possession. On August 16 the machine was shipped. The other company to which Low and associates had sold was the plaintiff. Dealings between Low and Mastracchio broke down over assurances as to patentability which the latter wanted included in the contract and Low was unwilling to include.
Mastracchio had seen the J.C.L. machine at an industry show held in Atlantic City in March or April 1960. Both he and Alessi examined it then. No restrictions were placed upon them, and a rough sketch was made which later furnished the substance of a schematic drawing or sketch which was sent out to possible customers in an attempt to arouse enough interest to justify the development of a new model in the regular Bell-Mark line. During the trial much attention was paid to this drawing. It is dated April 5, 1960, some three months before Low and Mastracchio met. The plaintiff contends that Mastracchio's dealings with Low about a machine in which Bell-Mark had already shown so much interest indicate an unscrupulous attempt to get more details of the construction. On the other hand, it can be argued that no conditions of confidence were imposed by Low and that there could be no implied breach of faith with respect to a machine which had earlier been sketched at a public show. I see no need to resolve these matters; Bell-Mark has never made or sold the J.C.L. Sideline Coder or a machine like it. Bell-Mark does have a model which is designed to mark the bottom of containers, i.e. do the same work as the J.C.L. I saw it *170 in operation, however, and heard testimony about its features. It is a quite different machine. This conclusion also enables me to pass over the question as to whether or not the plaintiff, merely by proving a purchase of the J.C.L. machine from its former owner, has established a proper base from which to assert a cause of action against Bell-Mark for an equitable tort allegedly perpetrated against Low.
The defendant Bell-Mark on its counterclaim has failed to prove a case against the plaintiff. The contentions of the defendant Clark with regard to his counterclaim, as those contentions are stated in the pretrial order, relate only to the effect upon Clark of the judgment in Adolph Gottscho, Inc. v. American Marking Corporation, supra. I conclude that his counterclaim has no legal merit.
As to the counterclaims, there will be a judgment in favor of the plaintiff. On all aspects of the plaintiff's affirmative case there will be judgment in favor of the defendants and against the plaintiff. Costs to the defendants.