The A. H. EMERY COMPANY, Plaintiff,

v.

MARCAN PRODUCTS CORPORATION, Marshall Control Products Corp., Hugh A. Mills, Ronald R. Marshall, and David E. Golding, Defendants.

No. 62 Civ. 265.

United States District Court
S. D. New York.

Feb. 17, 1967.

John C. Blair, Stamford, Conn., for plaintiff; Blair Buckles & Cesari, Ronald J. St. Onge, Charles I. Sherman, Stamford, Conn., of counsel.

Hopgood & Calimafde, New York City, for defendants; John M. Calimafde, Roy C. Hopgood, New York City, of counsel.

McLEAN, District Judge.

In the opening paragraph of its amended complaint, plaintiff describes its action as follows:

"This is a civil action wherein Plaintiff charges the Defendants with breach of a confidential relationship, appropriation of trade secrets, unfair competition, breach of contract, patent infringement, and conspiring to effect the above."

Plaintiff seeks an injunction, damages, an accounting of profits, and an allowance of attorneys' fees.

The patent referred to is Patent No. 2,-960,328 on "weighing apparatus and systems," issued on November 15, 1960, upon an application filed on July 5, 1957, to Malcolm C. Tate, and assigned by him

to plaintiff, his employer. Defendants have asserted a counterclaim seeking a declaration that the patent is invalid and that products manufactured and sold by defendants do not infringe it.

Defendants rested at the close of plaintiff's case and moved to dismiss the complaint and for judgment on their counterclaim. They assert that the evidence necessary to the determination of the counterclaim is already in the record, having been introduced in the course of plaintiff's case.

There are differences between the claims made by plaintiff in its complaint and the evidence which it has offered to support them. At the close of its case, plaintiff conceded that it had offered no evidence of infringement and that its claim of patent infringement must therefore be dismissed on that ground. It further conceded that it had offered no evidence in support of its allegations that defendants have attempted to palm off their product as the product of plaintiff. It is also clear that there is no evidence of any express contract between the parties, and hence no showing of the breach of any such contract. What this case boils down to, as far as plaintiff's case is concerned, is the charge that defendant Mills, a former employee of plaintiff, misappropriated certain of plaintiff's trade secrets and made use of them, along with his co-defendants, to manufacture and sell a hydraulic load cell which competes with a cell manufactured and sold by plaintiff.[1]

The amended complaint alleges that jurisdiction of the subject matter of this action rests upon 28 U.S.C. § 1338(a) and (b). There is no allegation of diversity of citizenship and in fact there is no complete diversity, as both plaintiff and defendant Mills are citizens of Connecticut.

28 U.S.C. § 1338(a) confers upon the district courts original jurisdiction of "any civil action arising under any Act

---

[1]. The obligation of an employee not to reveal trade secrets disclosed to him in confidence by his employer has been said to rest on an "implied contract." Presumably, this is the basis of the "breach of contract" allegation in the complaint.

of Congress relating to patents * * *." Section 1338(b) confers original jurisdiction "of any civil action asserting a claim of unfair competition when joined with a subsantial and related claim under the copyright, patent or trade mark laws."

Although the parties have stipulated in the pretrial order that this court has jurisdiction, they are powerless to confer jurisdiction by consent if none in fact exists. In view of plaintiff's failure to offer any evidence in support of its claim of patent infringement, it is necessary to consider whether this court has jurisdiction of the claim of misappropriation of trade secrets. Under Section 1338(b), this comes down to whether that claim can fairly be said to be joined with "a substantial and related claim" of patent infringement. Section 1338(b) expresses the doctrine of pendent jurisdiction. Cases in fields other than patents which define that doctrine would seem to be as apposite here as patent cases.

Whether the federal claim, in this instance the claim of patent infringement, is or is not "substantial" is to be determined on the basis of the pleadings, not upon the evidence ultimately introduced at the trial. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062 (1933); Schreyer v. Casco Products Corp., 190 F.2d 921 (2d Cir. 1951), cert. denied, 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952).

On that basis, plaintiff's claim of patent infringement, properly alleged in the complaint, is substantial.

Whether the federal claim of patent infringement and the state claim of misappropriation of trade secrets are "related," depends upon whether they "derive from a common nucleus of operative fact." United Mine Workers of America v. Gibbs, supra, 383 U.S. at 725, 86 S.Ct. at 1138.

Plaintiff charges that defendants used confidential information pertaining to the design and construction of plaintiff's hydraulic load cell in order to manufacture and sell, in competition with plaintiff, a load cell which imitates plaintiff's. They claim that this conduct not only is actionable under state law, apart from patents, but that in this case it also involves federal law because the cell infringes the patent which issued to plaintiff's assignor early in the course of defendants' activities. The cell covered by the patent is the same as the cell described in greater detail in the drawings which defendants allegedly misappropriated. The design and construction of plaintiff's cell and of defendants' are "operative facts" in both the federal and state claims. Hence there seems to be a sufficient "common nucleus." The authorities in comparable situations indicate that the two claims asserted here are sufficiently related for jurisdictional purposes. Schreyer v. Casco Products Corp., supra; Telechron, Inc. v. Parissi, 197 F.2d 757 (2d Cir. 1952); see Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538 (2d Cir. 1956); Bullock v. Sears Roebuck & Co., 239 F.2d 170 (2d Cir. 1956). It follows that the court has jurisdiction of the subject matter of this action and of both claims asserted in it.

In United Mine Workers of America v. Gibbs, supra, the Supreme Court said that even though the court has jurisdiction of the state claim, i. e., power to decide it, it must still determine, in its discretion, whether or not it will exercise that power. In the present case, as events turned out at the trial, plaintiff did not press its patent claim. But the validity of the patent must still be determined because of defendants' counterclaim. It makes no real difference, therefore, whether plaintiff offered evidence in support of its claim of infringement or not. Moreover, the state claim of misappropriation of trade secrets has been fully and vigorously litigated. It would be highly wasteful of the time, effort and expense which both

sides have expended upon this case to dismiss the claim at this late date and to compel the parties to litigate it anew in the state court. Consequently, the court will exercise its jurisdiction and will determine this entire controversy.

I turn now to the evidence, some of which is conflicting. Credibility plays an important part in some aspects of this case. I observed the witnesses on the stand and took note of their demeanor while testifying. I have taken these observations into account in deciding what testimony to accept and what to reject. Upon all the evidence which I consider credible, I find the facts to be as follows.

Plaintiff, a Connecticut corporation having its principal place of business in New Canaan, Connecticut, has been engaged for many years in the manufacture of weighing devices and of "systems" of which such devices form a part. Plaintiff enjoys an excellent reputation in that field. The hydraulic load cell with which we are here concerned is such a device. In essence, it consists of a "loading head" or platform resting upon a "load block" which in turn rests upon a piston. Below the piston is a diaphragm which covers a cavity or chamber which contains an oil-based hydraulic fluid. The device rests upon a metal base and the whole thing is enclosed in an outer aluminum casing. A protective rubber covering or "boot" surrounds a portion of the outer casing.

When the load to be weighed is placed upon the loading head, it presses down upon the block which in turn presses upon the piston, which presses down upon the diaphragm, which presses upon the fluid. The fluid then flows out into a measuring instrument which records the weight of the load.

It is necessary that such a weighing mechanism be highly accurate. Plaintiff's product meets this requirement. Plaintiff warrants its cells to be accurate to one-tenth of one per cent, i. e., the cell will not err more than one pound in recording the weight of a 1,000 pound load.

There are of course other parts to this device in the way of rings, clamps, springs, screws, etc., which I have not attempted to include in this simplified description. Most important of these additional parts, for present purposes, is the ball, which may be either "high" or "low." Plaintiff makes both types. The patent describes a "low ball" cell.

The ball is made of steel. In the low ball construction the ball is contained in a recess in the piston below the load block. The weight of the load rests first upon the ball and is transmitted through it to the piston and on down to the fluid. The purpose of the ball is to permit a slight sideways motion of the load block which may occur if the load to be weighed is placed on the loading head in an off center position instead of squarely upon it. If the block were not free to move sideways in this fashion, the lateral pressure of the off center load would distort the measurement.

In a "high ball" cell, the ball serves the same purpose. It is "high" because it is located, not in a recess within the piston, but on top of the piston under the loading head.

Defendant Mills, who figures prominently in this case, was employed by plaintiff from March 3, 1943 until March 25, 1960. Mills had had engineering training in his youth. He attended Stevens Institute of Technology and although he did not graduate, he studied mechanical engineering there which included a course in hydraulics. He also studied drafting. When he left Stevens in 1935, he went to work for the Norma-Hoffmann Bearings Corporation in Stamford, Conn., where he was engaged in engineering research. He left Norma-Hoffmann to enter plaintiff's employ as an engineer. He continued to do work of an engineering nature until 1946 or 1947 when he transferred to selling activities and devoted the principal part of his time to soliciting orders. Mills became thoroughly familiar with the design and construction of plaintiff's cell and with plaintiff's manufacturing technique.

On March 25, 1960, Mills was dismissed from plaintiff's employ. Plaintiff considered that his services as a salesman were not sufficiently productive. Other reasons were hinted at but never fully explained. Mills was surprised and shocked by his dismissal. There seems to be no doubt that after his dismissal he harbored ill feeling toward plaintiff, whatever plaintiff's feelings may have been toward him.

In July 1960, a few months after his dismissal, Mills made the acquaintance of defendant Marshall, who was a manufacturers' sales representative in a small way. Among the companies for whom he solicited business was a manufacturer of weighing systems of a type wholly different from those involved here. Marshall shared office space at 60 East 42nd Street, New York, with defendant Golding, who did business with Reuben Scherr under the name of David E. Golding & Associates. They did "consulting" work of an engineering nature. Golding has a degree in industrial engineering from Rensselaer Polytechnic Institute.[2]

On July 26, 1960, Golding and Scherr incorporated defendant Marcan Products Corporation (Marcan) under the laws of New York. Although Scherr was president, he took no active role in the company. Golding was vice president and chief executive. Although the principal corporate purpose of Marcan, according to its certificate of incorporation, was to "conduct a mercantile business dealing in plastic and other materials," Golding testified that its business was "to manufacture and sell weighing systems." He testified further that Marcan actually did not manufacture anything. It "only assembled, calibrated and tested."

On August 2, 1960, approximately a week later, Mills, Marshall and a third man, Toll, formed defendant Marshall Control Products Corporation (Marshall Control), a New York corporation. Toll's only contribution was part of the capital. He did not participate in the operation of the business. The purpose of Marshall Control was to act as manufacturers' sales representative. Among the "manufacturers" which it represented was Marcan. Marshall Control had its office at the 60 East 42nd Street suite along with Marcan, David E. Golding & Associates and the accountants.

At some time in 1959 Mills had assembled a complete Emery cell out of discarded parts, some of which he obtained from plaintiff's premises and some of which he procured at a junk yard. He did this at his home in New Canaan, Conn. The cell was one of plaintiff's standard models, type "EC 30."[3] It had a "low ball."

Mills testified that his purpose in assembling this cell was to enable his daughter to exhibit it at a junior high school science fair. Although this may have been his purpose at that time, shortly after his discharge he put it to quite a different use. In August 1960 he brought the cell to Golding in New York. He did so in order to ascertain whether Golding could copy it with a view to having the copy manufactured and sold in competition with plaintiff. Golding thought that he could, despite the fact that he had had no previous experience with hydraulic load cells.

Golding disassembled the cell and made crude sketches of certain of its parts. In studying it, he had the advantage of one of plaintiff's assembly drawings of an Emery low ball EC 30

---

2. Golding's accountants also share this office. Since the entire space amounted to only some 450 square feet, the premises would seem to have been somewhat crowded.

3. This designation has caused some confusion in this case where the witnesses have made it a practice to refer to the different sizes of cells by the square inch area of the piston. The "30" in "EC 30" does not purport to refer to that area. The square inch area of the piston in this model is 25 square inches. Another size which will be subsequently referred to has a piston area of 45 square inches.

cell. Golding was vague as to how he obtained this drawing. It is obvious that Mills must have brought it to him. I so find.

Golding's next step was to hire a professional draftsman, the Hoffman Company, to make an assembly drawing of the low ball cell. Hoffman also made an assembly drawing of a high ball cell. Apparently at that point Golding had not decided which type he would attempt to make.

On September 1, 1960, Golding requested quotations from various foundries for the supply of castings for certain parts of the cell. Several quotations came to him by late September.

At about that time, Golding consulted Treichler, a machinist who did business in New Jersey under the name of Nirol Manufacturing Company. Golding explained the project to Treichler, showed him the parts of the Emery cell which Mills had given him, and asked Treichler to design jigs for use in manufacturing certain of these parts. Treichler made drawings for jigs in November 1960.

In the meantime, on October 31, 1960, Marshall Control submitted a quotation to Scientific Design Co. Inc. offering to sell to it four "Marcan Hydraulic Load Cells" and other instruments which together make up a weighing system. The quotation was signed by Mills. On November 11, 1960, Scientific Design Co. Inc. accepted the order and sent its purchase order to Marshall Control, directed to Mills' attention, for the weighing system.

On November 15, 1960, the Tate patent on a low ball cell was issued and assigned to plaintiff. Mills promptly heard about it and secured a copy of it. This obviously raised a problem. Mills and Golding consulted Hopgood, a patent lawyer, on the subject. In December 1960, Hopgood advised them that in his opinion the low ball cell which they contemplated making would infringe the patent, but a high ball cell would

not. Mills and Golding decided to make the high ball type. They called their cell an M–25 because the area of the piston was 25 square inches, the same as the Emery EC 30.

They pushed ahead on the project in order to be in a position to fill the order from Scientific Design. On December 4, 1960 Golding, on behalf of Marcan, ordered some rubber "boots" for the cell from Minor Rubber Company, whose place of business was in New Jersey. This was the company which supplied boots to plaintiff. Golding and Mills of course knew this. Indeed, the purchase order specifices that the boots are to be "identical with part No. A–14662–Neoprene Dirt Seal made for the A. H. Emery Co. of New Canaan, Conn." Minor supplied the boots. In making them, it used molds in its possession which belonged to plaintiff.[4]

Treichler obtained jigs from a tool maker and castings from a foundry and set about machining the castings. Early in January the first cell was ready for assembly. Theichler had had no previous experience with hydraulic load cells any more than Golding had. Mills showed them how to test it. The work of assembling the cell was done at Marcan's plant in New Jersey.

On January 31, 1961, Marshall Control shipped the instruments constituting the weighing system, including the four Marcan M–25 cells, to Scientific Design in fulfillment of its order. The cells were of the high ball type, but except for the location of the ball, which required a higher piston and a correspondingly higher outer casing, they were essentially the same as plaintiff's EC 30 cell. A few minor differences in a dimension here and there were without significance in the functioning of the cell.

I come now to the subject of drawings, which is the crux of this case. The evidence satisfies me, and I so find, that it is impracticable to construct a

---

4. Plaintiff found out about this considerably later and put a stop to this use of its property. In June 1962, Marcan ordered its own molds from Minor.

cell which will have the necessary accuracy merely by looking at another cell and attempting to copy it. Detailed working drawings of the different parts, drawings which show precise tolerances and very exact dimensions, are essential. A dimension can, it is true, be determined in most instances by very careful measurement of an existing physical part, but a tolerance cannot. Tolerance is the extent to which a part may vary from a particular dimension and still work properly. Obviously, a physical part can reveal to an observer only what its dimension actually is, not how much larger or smaller it might be.

These precise dimensions and tolerances were not disclosed in the Tate patent.

Treichler made a set of drawings for the various parts of a 25 square inch cell. The Marcan cell was made from these drawings.

Each drawing is dated January 2, 1961. The drawings show tolerances as well as dimensions. Some of them specify the material of which the part is composed, notably "C 1117 steel" and "Ryerson 5–317" steel. Defendants claim that Treichler made these drawings from observing the parts of the Emery cell which Mills had brought to Golding and from information given him by Golding's sketches and orally by Golding and Mills. I do not accept this claim, for reasons which will presently appear.

Robert Northrop was a draftsman employed by plaintiff for eleven years until September 1960, when he left plaintiff's employ. He had spent most of those eleven years drawing parts of Emery cells, particularly the EC 30 cell which was Emery's principal product. He was thoroughly familiar with their dimensions and tolerances.

In December 1960, in Connecticut, Mills asked Northrop to prepare a complete set of drawings for parts of a cell having a 25 square inch piston area. This could only mean the Emery EC 30, the cell with which Northrop was so thoroughly conversant. It is plain

that this is what Mills intended, whether he expressly said so or not, and that Northrop so understood. Northrop agreed to do so.

Northrop prepared a complete set of parts drawings for an EC 30 low ball cell, showing dimensions, tolerances and also specifying "C 1117 steel" and "Ryerson 5–317" steel. He drew these from memory, doing his best to duplicate the drawings of plaintiff's EC1 30 parts. Northrop did this work at his home in Connecticut. He delivered his drawings to Mills in Connecticut. Mills delivered them to Golding in New York. Golding knew that they came from Northrop. He also knew that Northrop was an ex-employee of plaintiff.

The Treichler drawings dated January 2, 1961, for the most part, contain the same dimensions, and more important, the same tolerances, as the Northrop drawings. Moreover, it appears that Northrop's memory was faulty in some respects and that some dimensions shown on his drawings differ from those of the actual Emery part. In such instances, Treichler's drawings reflect Northrop's dimensions, not the actual dimensions of the part which Treichler purported to measure. There are too many instances of this sort to attribute them to coincidence.

Moreover, the evidence shows that one cannot tell by looking at a piece of steel that it is "C–1117," but nevertheless this designation appears on both the Treichler and the Northrop drawings. Finally, to cap the climax, it turns out that "Ryerson 5–317" steel which is specified on both the Northrop and Treichler drawings, was a mistake on Northrop's part. The Ryerson company does not make a steel of that designation. The conclusion is irresistible that Treichler copied the Northrop drawings, with such changes as were made necessary by the different location of the ball, the higher piston and casing, and with a few minor differences which may in fact have been contributed by Golding.

Another fact may be noted which strengthens this conclusion. Some of the

figures on certain of Treichler's drawings have been altered. The testimony of a handwriting expert called by plaintiff demonstrates that the figures which appeared on the drawings prior to the alteration are the same as those on the corresponding Northrop drawings.

Mills, Golding and Treichler all denied the copying. They offered no plausible explanation of why the drawings which Mills had taken the trouble to obtain were not used. I do not believe their testimony in this respect. I find that Mills, Golding and Treichler did use the information contained in the Northrop drawings to enable them to construct the Marcan M–25 cell.

Unless Treichler's drawings, all of which are dated January 2, 1961, are misdated, Treichler must have had access to Northrop's drawings before that date. It is most probable that he did, in view of the fact that Marcan's first cells were shipped on January 31 and that detailed parts drawings were necessary to the manufacture of a successful cell. Northrop's testimony on direct is not seriously inconsistent with this view. He testified that Mills requested him to make the drawings "around Christmastime" of 1960, and that he delivered them "three or four weeks" later. Northrop's recollection, after almost six years, could easily have been mistaken on a matter of a few weeks. Moreover, Mills testified that he made his request of Northrop in later November or early December, and he buttressed this date with a convincing recollection that on the occasion of his visit to Northrop, his automobile was stuck in Northrop's driveway in the first snow of the year. I accept Mills' recollection rather than Northrop's as to the date of the request. A delivery of the drawings "three or four weeks" thereafter would mean a delivery in late December 1960 which ties in neatly with Treichler's date of January 2, 1961 on his copies.

It is true that on cross examination Northrop was shown a check drawn by Mills to Northrop's order in the amount of $150. The check is dated June 14, 1961. Northrop thereupon changed his testimony and said that he delivered the drawings in June, when he received this check in payment for his services. I believe that he was mistaken in so testifying. The probabilities are either that there was a delay between the delivery of the drawings and Mills' payment therefor, or that the payment in June was for another set of drawings mentioned hereinafter.

I find, therefore, that Northrop delivered his drawings of EC 30 parts in late December 1960, that Treichler copied much of the data, and that Treichler's date of January 2, 1961 on his drawings is at least approximately correct. I may note, moreover, that even if the delivery was later, which would mean that Treichler's drawings are misdated, it would still make no material difference, for the essential point is that Northrop's data was used by Treichler, whenever he obtained it, with the knowledge and consent of Mills and Golding, to construct the Marcan cell, and as to that I have no doubt.

In the summer of 1961, Marcan began the manufacture of a larger high ball cell called M–45 because it had a piston area of 45 square inches. Treichler made a set of drawings of parts for this as well. Some of the drawings are dated April 16, 1961, some May 12 and 15, 1961, and the rest July 26, 1961.

In the spring of 1961, Mills approached another Emery employee, Bradley, and asked him to do some drafting work for him with respect to weighing equipment. Bradley refused.

Thereafter, Mills acquired some drawings of an Emery cell which was of a larger size than the EC 30. Mills delivered these drawings to Golding. Golding knew where they came from. Just when Mills acquired them does not appear. These drawings were never produced, hence it is impossible to be sure that the cell to which they related was a 45 square inch cell, although one may suspect that it was. Because the drawings are missing, it is impossible to com-

pare them with Treichler's drawings, as can be done in the case of the M-25.

Mills testified that these drawings were made by Northrop while Northrop was in plaintiff's employ, but that he, Mills, did not obtain them from Northrop, but rather from a sales representative of plaintiff, Shannon. Shannon, who is no longer employed by plaintiff, was not called as a witness by either side. Northrop denied any part in this transaction. It makes no difference in this case whether he was a party to it or not.

Mills and Golding each testified that as in the case of the drawings for the smaller cell, they made no use of the Northrop drawings for the larger cell. Although the drawings are not available to refute this testimony, it is so highly unlikely that I do not credit it. The probabilities are that Mills, Golding and Treichler used this data in the construction of the M-45 cell.

Subsequent events which occurred after this action was begun on January 17, 1962 may be briefly noted. In February 1962, Mills sold his stock in Marshall Control to Marshall and entered directly into Marcan's employ. Early in 1963, Marcan began to manufacture a low ball cell of the type covered by plaintiff's patent. Before doing so, Mills and Golding consulted Hopgood again. He advised them that in his opinion they might safely do so because plaintiff's patent was invalid.

In May 1963, Golding and Scherr sold their stock in Marcan to Mills and disappeared from the scene. Mills has operated Marcan ever since, manufacturing both high ball and low ball cells. Treichler continued to work for Marcan until sometime in 1966, machining parts for the cells.

There is not much evidence as to how many cells Marcan manufactured and sold. Golding testified that until his departure in 1963, Marcan made something over 50 M-25 cells and around 20 or 30 M-45s.

I turn now to a consideration of the law pertaining to trade secrets. Further facts which must be found in order to determine the application of these legal principles to this case will be referred to in the course of this discussion.

■ The law which governs this aspect of the case is state law. A question naturally arises at the outset as to which state law, as a matter of conflicts, is to be applied. If this were a diversity case, this court would follow the New York rule of conflicts. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941). But this is not a diversity case, but rather one in which the state claim is within the court's jurisdiction because it is pendent to the federal patent claim. No authority has been found which specifies the conflicts rule to be followed in such a situation. It seems appropriate, however, to adopt the New York rule, particularly since, as far as appears, there is no federal rule of conflicts peculiar to pendent jurisdiction cases.

Under New York's grouping of contacts principle (Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E. 2d 279, 95 A.L.R.2d 1 (1963)), theoretical difficulties could arise in choosing the appropriate state law among three possibilities, Connecticut, New York and New Jersey. It was in Connecticut that Mills and Northrop were employed by plaintiff. It was there that they learned about the design and construction of plaintiff's load cell. It was there that Mills made the cell out of discarded parts and he there induced Northrop to make the drawings. Northrop made the drawings in Connecticut.

On the other hand, Golding and Marshall were in New York, the two corporations, Marshall Control and Marcan, were New York corporations doing business in New York. Mills brought the Emery cell and the Northrop drawings to Golding in New York. It was in New York that the enterprise of copying plaintiff's product was conceived, and from New York that it was directed.

Most of the physical work was done in New Jersey at Treichler's place of business, and at Marcan's plant. It was also in New Jersey that Minor supplied Marcan with the boot made from plaintiff's molds.

Fortunately, the problem, however difficult in theory, has no practical importance in this case. There seems to be no material difference on this subject between the law of Connecticut and New York, or between either of them and New Jersey. The case is governed by general common law principles. The decisions in all three states rely upon Section 757 of the Restatement, Torts (1939). Decisions in other states cite it also. They would seem to be as valuable as decisions of Connecticut, New York and New Jersey in exemplifying the common law.

Section 757 of the Restatement states the basic rule as follows:

"One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if * * *

"(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or

"(c) he learned the secret from a third person with notice of the facts that it was a secret and * * * that the third person's disclosure of it was otherwise a breach of his duty to the other, * * *."

Leading cases in Connecticut, New York and New Jersey, respectively, which illustrate this general principle are: Allen Manufacturing Co. v. Loika, 145 Conn. 509, 144 A.2d 306 (1958); Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12 (1889); Sun Dial Corp. v. Rideout, 16 N.J. 252, 108 A.2d 442 (1954).

■■ A confidential relationship exists between an employee and his employer. It survives the termination of his employment. It does not depend upon any express contract. Disclosure by an employee of a trade secret entrusted to him by his employer in the course of his employment is the classic instance of a disclosure which constitutes a breach of confidence and which is therefore actionable. It is not necessary that the employee expressly agree not to disclose it. Sperry Rand Corp. v. Rothlein, 241 F. Supp. 549 (D.Conn.1964); Allen Manufacturing Co. v. Loika, supra; Little v. Gallus, 4 App.Div. 569, 38 N.Y.S. 487 (4th Dept.1896); Friedman v. Stewarts Credit Corp., 26 N.Y.S.2d 529 (Sup.Ct. 1939), aff'd, 261 App.Div. 990, 26 N.Y.S. 2d 533 (2d Dept.1941); Thiberg v. Bach, 107 F.Supp. 639 (D.N.J.1952), aff'd, 203 F.2d 956 (3rd Cir. 1953); Sun Dial Corp. v. Rideout, supra.

■ And third parties who use the secret with knowledge of the breach of confidence are equally liable with the ex-employee himself. Lamont, Corliss & Co. v. Bonnie Blend Chocolate Corp., 135 Misc. 537, 238 N.Y.S. 78 (Sup.Ct.1929); Friedman v. Stewarts Credit Corp., supra; Minnesota Mining & Mfg. Co. v. Technical Tape Corp., 23 Misc.2d 671, 192 N.Y.S.2d 102 (Sup.Ct.1959), aff'd, 15 A.D.2d 960, 226 N.Y.S.2d 1021 (2d Dept. 1962); Stone v. Goss, 65 N.J.Eq. 756, 55 A. 736, 63 L.R.A. 344 (Ct.Err. & App.1903).

These principles are well settled. The principal legal question here is whether what Mills disclosed, and what he induced Northrop to disclose, was a trade secret. According to the Restatement, a trade secret may consist "of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement, Torts § 757 comment b (1939).

■ Secrecy is a relative term. The information may be known to several persons and yet may still be secret if third parties would be willing to pay for a breach of trust in order to ascertain it. L. M. Rabinowitz & Co. v. Dasher, 82 N.Y.S.2d 431 (Sup.Ct.1948).

■ Detailed drawings and blueprints of a machine can be trade secrets. Schreyer v. Casco, 190 F.2d 921 (2d Cir. 1951), cert. denied, 342 U.S. 913, 72 S.Ct. 360 (1952); L. M. Rabinowitz

& Co. v. Dasher, supra; Adolph Gottscho, Inc. v. American Marking Corp., 35 N.J. Super. 333, 114 A.2d 19 (1954), aff'd, 18 N.J. 467, 114 A.2d 438 (1955), cert. denied, 350 U.S. 834, 76 S.Ct. 69, 100 L.Ed. 744 (1955); Solo Cup Co. v. Paper Machinery Corp., 240 F.Supp. 126 (E.D. Wisc.1965), modified, 359 F.2d 755 (7th Cir. 1966); Servo Corp. v. General Electric Co., 337 F.2d 716 (4th Cir. 1964), cert. denied, 383 U.S. 934, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966); Schulenburg v. Signatrol, Inc., 33 Ill.2d 379, 212 N.E.2d 865 (1965).

■ And it is as much a breach of confidence for an employee to reproduce his employer's drawings from memory as to copy them directly. Adolph Gottscho, Inc. v. American Marking Corp., supra. See Sperry Rand Corp. v. Rothlein, supra.

■ Prior to this action, plaintiff did not stamp its parts drawings with the word "confidential" or "secret." [5] But such an express labelling is not necessary to make them a secret, if in fact they were confidential. Allen Manufacturing Co. v. Loika, supra.

Defendants contend that plaintiff's parts drawings were freely made available to third persons and hence were not in fact kept secret. The evidence does not convince me that this contention is correct.

It seems to be true that plaintiff sent out assembly drawings from time to time to its customers and published such drawings, or simplified schematic diagrams of the cell, in instructional manuals, advertising brochures and the like. It is also true that a man named Roessler, in August 1958, published an article in a technical journal, with plaintiff's knowledge and acquiescence, which discussed the Emery cell and illustrated it by diagrams and figures. But assembly drawings and diagrams are different from parts drawings. They are overall representations of the entire cell. They do not contain as much detailed information as is set forth upon the actual drawings of the separate components. Although it is also true that from time to time customers and other third parties visited plaintiff's plant, they were not permitted unrestricted access to plaintiff's design and manufacturing information. The parts drawings were kept in the engineering department room, the doors to which were locked at night. I do not believe Mills' testimony to the contrary.

Upon all the evidence, I find that the detailed data contained in the parts drawings was intended by plaintiff to be confidential and in fact was kept confidential, for use only by plaintiff's employees in the course of their employment, and that the employees, specifically Mills and Northrop, so understood.

Finally, a contention upon which defendants place considerable emphasis must be considered. They point to the principle, mentioned in many of the cases, that a man may copy another man's work with impunity, assuming that it is not patented, as long as he bases his copy on his own observation of the product. Whatever the unpatented machine itself discloses is not a trade secret. Defendants claim that this is the case here. In making that claim, they have directed their attack primarily against a list of alleged trade secrets, in the nature of a bill of particulars, which plaintiff filed with the court, at the direction of Chief Judge Ryan, early in the course of this litigation. Apparently at the time this list was prepared, plaintiff was unaware of the activities of Mills and Northrop with respect to parts drawings, evidence of which plaintiff subsequently discovered.

This document itemizes certain features of plaintiff's cell which plaintiff considers particularly important to the accuracy of the device. These include the neoprene disc, the purpose of which is to eliminate friction, the raised plateau in the base, to reduce pinching of the diaphragm when the cell is under load, "distorted" dimensions of the piston and

---

5. Plaintiff has done so subsequently, obviously as a result of this experience.

the casing ring to allow for the "seating" of the wires which support the bridge ring, and the like. Although it is doubtless true that these features have been carefully developed by plaintiff after long experience, through laborious trial and error, the fact remains that, at least in large measure, they are observable to the naked eye of the would-be copier, once the cell has been broken down into its component parts.[6] Although I do not believe that Golding and Treichler in fact did measure the various parts of the cell which Mills brought them with great precision, since they no doubt found it easier to rely on the Northrop drawings, it is hard to see how, under the circumstances, these items listed in plaintiff's bill of particulars can fairly be said to be trade secrets.

But there is more to plaintiff's case than these physical features. Primarily there are the Northrop drawings of plaintiff's EC 30 cell.[7] Not only do these drawings record the dimensions of the various parts with greater accuracy than a copier would be likely to measure them, but more important, they contain precise tolerance information which the copier needed to have in order to know the extent to which he might safely deviate from the prescribed dimensions. Some of these dimensions must be adhered to down to a tiny fraction of an inch in order to achieve accuracy of performance. Generally accepted commercial tolerances will not suffice. The allowable clearances, i. e., the permissible distance between two parts, which are ascertainable from the drawings, are equally essential. Working drawings of a machine as sensitive as this might well be thought to be more important than the drawings of the machines which were involved in the cases cited above. Certainly, they are no less so. I see no reason to differ from the holdings of those cases nor any basis upon which they can be properly distinguished from the present case. I conclude, therefore, that the parts drawings were valuable trade secrets.

In addition to the drawings themselves, Mills also brought to the Marcan enterprise his knowledge of plaintiff's manufacturing techniques, his appreciation of the proper "feel" and "fit" of the parts, all that intangible expertise which is customarily referred to as "knowhow." This knowledge and skill he had acquired in the course of his employment with plaintiff. It pertained specifically to plaintiff's product. It was not a mere general mechanical knowledge and ability. This knowledge is in the nature of a trade secret, at least the cases treat it as analagous. For Mills to employ it for his own advantage and that of his associates to plaintiff's detriment was a breach of confidence. Thiberg v. Bach, supra; Adolph Gottscho, Inc. v. American Marking Corp., supra; L. M. Rabinowitz & Co. v. Dasher, supra.

I conclude that Northrop violated his obligation to keep confidential the engineering data disclosed by the parts drawings when he reproduced those drawings from memory. I conclude that Mills induced and participated in this violation. He is in no better position than if he had extracted copies of the drawings from plaintiff's files. I conclude that Golding, who used the drawings in the construction of the Marcan cell, with full knowledge of the fact that they had been obtained through a breach of trust, is equally responsible with Mills for that breach. Liability also rests up-

---

6. There may be some question as to whether this is true of the neoprene disc which, according to Tate's testimony, is apt to be reduced to a "gummy mess" through use, so that it would be difficult accurately to measure such a disc in a used cell.

7. Mention may also be made again of the drawings made by Northrop of the larger Emery cell which Mills obtained from Shannon and which, it seems probable, were also used by Golding and Treichler, although plaintiff was unable to prove this in the absence of the drawings themselves. Shannon was not authorized to make these available to Mills, any more than Northrop was.

on Marcan which made and sold the offending cell.

■ As to Marshall Control and Marshall individually, the situation is different. Marshall Control was a sales representative of Marcan from the beginning, and apparently still is. There is little or no evidence as to its activities, except with respect to obtaining the first order for a Marcan cell, the order from Scientific Design, received in November 1960. Mills, who was then a part owner of Marshall Control, seems to have been the man who handled this order primarily, although Marshall introduced him to the customer in the first instance. Plaintiff has not proved that Marshall had any part in the construction of the Marcan cell, although, of course, he must have been aware of it. Plaintiff has not proved that Marshall had anything to do with obtaining or using the Northrop drawings. Plaintiff has failed to show that Marshall participated in Mills' breach of trust.

Plaintiff is entitled to injunctive relief against all defendants restraining them from using the trade secrets which were misappropriated. I feel the need of further argument on the scope and duration of that relief, particularly as to whether it is appropriate in this case to limit the injunction to a specified time period, as was done in Triangle Sheet Metal Works, Inc. v. Silver, 154 Conn. 116, 222 A.2d 220 (1966). I will hold a hearing for this sole purpose at 10:00 A.M. on Monday, February 27, 1967.

Plaintiff is also entitled to recover damages, if it can prove any, from Mills, Golding and Marcan, or in lieu of damages, to an accounting of profits from those three defendants. Plaintiff has failed to prove a sufficient participation in the wrong on the part of Marshall Control or Marshall individually to entitle it to damages or an accounting of profits as to those defendants. A date for the taking of testimony with respect to damages and profits will be fixed after the injunction has been issued. At that hearing both sides may offer testimony, if they so desire, with respect to attorneys' fees.

### Defendants' Counterclaim

Although during the course of the trial, defendants introduced a volume of prior patents said to constitute such prior art as to render the Tate patent invalid, they offered no testimony with respect to these patents and at the close of the case they stated that they did not seek a determination of invalidity on this ground. They limit their attack on the Tate patent to two contentions:

(1) That it is invalid under 35 U.S.C. § 102(b) because the invention was "in public use or on sale in this country, more than one year prior to the date of the application" for the patent.

(2) That it is invalid under 35 U.S.C. § 112 because the specification does not contain "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains * * * to make and use the same * * *."

As to the first contention, inasmuch as the application was filed on July 5, 1957, the question is whether the invention was in public use or on sale in this country prior to July 5, 1956. It is undisputed that on March 28, 1956 plaintiff sold and delivered to Hooker Electrochemical Company five cells which embodied the invention disclosed in the patent. Hooker paid for these cells on April 9, 1956. It is also undisputed that prior to May 25, 1956, plaintiff sold and delivered five such cells to Pratt & Whitney Aircraft, a division of United Aircraft Corporation, and that Pratt & Whitney paid for them by that date.

■ Plaintiff suggests that these sales do not invalidate the patent because they were for an experimental rather than a public use. On this issue plaintiff has the burden of proof, which it can discharge only by unequivocal and convincing evidence. Aerovox Corporation v. Polymet Mfg. Corporation, 67 F.

2d 860 (2d Cir. 1933); Robine v. Apco, Inc., 227 F.Supp. 512 (S.D.N.Y.1964).

There is no such evidence here. Plaintiff offered no explanation whatever of the sale to Hooker which, for all that appears, was a straight commercial transaction. As to the sales to Pratt & Whitney, there are a few documents, never satisfactorily explained, which indicate that in January 1956, plaintiff submitted to Pratt & Whitney several alternative designs for "ball heads" for EC 30 and EC 60 cells which Pratt & Whitney had previously purchased. The most that these documents can be said to show is that Pratt & Whitney was experiencing some difficulty with the cells and that plaintiff was suggesting some possible modification. In February 1956, Pratt & Whitney returned some cells to plaintiff for "repair, overhaul and modification." This evidence falls far short of proving that the sales to Pratt & Whitney were experimental rather than in the ordinary course of business.

■ I find that the invention disclosed by the patent was in public use and on sale in this country more than one year before the application was filed. The patent is therefore invalid under 35 U.S.C. § 102(b). It is thus unnecessary to consider the question raised under Section 112.[8]

Defendants are entitled to judgment on their counterclaim declaring that the patent is invalid under 35 U.S.C. § 102 (b). Under the circumstances, it is unnecessary to determine whether or not defendants' products infringe the patent. So much of plaintiff's complaint as seeks an injunction restraining infringement of its patent, and damages therefor, is dismissed.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

---

8. Plaintiff's reply brief in effect concedes the invalidity of the patent by stating, "We accept the fact that the Court may feel compelled to declare the Tate patent invalid." Plaintiff's attorneys appear to have been unaware of the sales to Hooker and to Pratt & Whitney when they began this action in January 1962. With commendable frankness, they disclosed the sale to Hooker in a letter to defendants' attorneys dated April 16, 1964.